1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT
9            SOUTHERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| ANNETTE CODY, individually and on behalf of all others similarly situated,<br><br>                                            Plaintiff,<br><br>v.<br><br>JILL ACQUISITION LLC, a Delaware entity, d/b/a WWW.JJILL.COM,<br><br>                                            Defendant. | Case No.:  25-CV-937 TWR (KSC)<br><br>**ORDER (1) VACATING HEARING AND TAKING MOTION UNDER SUBMISSION, (2) DENYING AS MOOT PLAINTIFF'S *EX PARTE* MOTION TO APPEAR VIA VIDEO CONFERENCE, AND (3) DENYING DEFENDANT'S MOTION TO COMPEL ARBITRATION**<br><br>(ECF Nos. 5, 9) |

        Presently before the Court is the Motion to Compel Arbitration and to Dismiss First Amended Complaint ("Mot.," ECF No. 5) filed by Defendant Jill Acquisition LLC, d/b/a www.jjill.com, as well as Plaintiff Annette Cody's Response in Opposition to ("Opp'n," ECF No. 7), and Defendant's Reply in Support of ("Reply," ECF No. 8) the Motion. Because the Court concludes that the Motion may be resolved on the papers without oral argument under Civil Local Rule 7.1(d)(1), the Court **VACATES** the hearing scheduled for July 3, 2025, and **DENIES AS MOOT** Plaintiff's *Ex Parte* Motion to Appear via Video Conference at the Hearing on Defendant's Motion (ECF No. 9).  Having considered the Parties' arguments, the record, and the law, the Court **DENIES** Defendant's Motion.

# BACKGROUND[1]

On March 14, 2025, Plaintiff filed a Class Action Complaint for Violations of (1) California Business and Professions Code §§ 17501 *et seq.*; and (2) the Consumers Legal Remedies Act, California Civil Code §§ 1750 *et seq.* in the Superior Court for the State of California, County of San Diego. (*See generally* ECF No. 1-3.) Defendant removed to this District on April 18, 2025, (*see generally* ECF No. 1), and Plaintiff filed the operative First Amended Class Action Complaint alleging the same causes of action as her original Complaint on April 21, 2025. (*See generally* ECF No. 2 ("FACAC").) Defendant filed the instant Motion on May 12, 2025. (*See generally* ECF No. 5.)

In her First Amended Class Action Complaint, Plaintiff alleges that she purchased a "Rib Knit Two Way Poncho" (the "Product") through Defendant's retail website, https://www.jjill.com/ (the "Website") on January 15, 2025. (*See* FACAC ¶ 10.) The Product was listed for a "discounted" price of $49.99 (with an additional 50% off), as compared to a "strike-through" reference price of $89.00. (*See id.*) Plaintiff alleges that the $89.00 reference price was fictitious, allowing Defendant to fabricate a "discounted" price. (*See, e.g.*, *id.* ¶¶ 1, 9, 12–14.)

Defendant contends that Plaintiff agreed to a "Binding Arbitration Agreement and Class Action Waiver" when she completed her purchase through Defendant's Website. (*See generally* ECF No. 5-1 ("Mem.").) To make her purchase, Plaintiff had to add the Product to her card by clicking the "Add to Bag" button:

/ / /

/ / /

/ / /

/ / /

---

[1] "[I]n deciding a motion to compel arbitration, [the court] may consider the pleadings, documents of uncontested validity, and affidavits submitted by either party." *Macias v. Excel Bldg. Servs. LLC*, 767 F. Supp. 2d 1002, 1007 (N.D. Cal. 2011).



(*See* ECF No. 5-2 ("Howard Decl.") ¶ 4; *see also* ECF No. 5-2 at 5–10 ("Ex. A") at 6.) Plaintiff next had to click the "Continue Checkout" button to proceed to the checkout page:



(*See* Howard Decl. ¶ 5; Ex. A at 7.)  At checkout, she was prompted to add her shipping address and select a shipping method:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



(*See* Howard Decl. ¶ 5; Ex. A at 8.)  She then needed to add a payment method:

(*See* Howard Decl. ¶ 6; Ex. A at 9.)  After clicking the "Proceed to Order Review" button, (*see* Howard Decl. ¶ 7), Plaintiff was taken to the Order Review page:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21



22  (*See* Howard Decl. ¶ 8; ECF No. 7-2 ("Ex. 1").[2])  It was at this stage that Plaintiff submitted

23  her order by clicking the "Place Order" button.  (*See id.*)  Directly above the "Place Order"

24
25

26  [2]    Although Defendant also provides a screenshot of the Order Review page, (*see* Ex. A at 10),
27  Plaintiff's and Defendant's screenshots differ in the number and placement of "Place Order" buttons.
(*Compare* Ex. 1 (displaying only one "Place Order" button at the bottom of the page), *with* Ex. A
(displaying three "Place Order" buttons—one at the bottom of the page and two others on the righthand
28  side of the screen).)  Because the Court must view the evidence most favorable to Plaintiff as the

button was this statement: "By clicking 'Place Order' you agree to J.Jill's **Terms of Use** & **Privacy Policy**." (*See id.*)  The phrase "Term of Use" was a blue, underlined hyperlink.[3] (*See* Howard Decl. ¶ 8.)

As of the date when Plaintiff placed her order, Defendant's "Terms of Use" explicitly called attention to the arbitration clause at the top of the page:

terms of use

January 1, 2023

THESE TERMS CONTAIN A MANDATORY INDIVIDUAL ARBITRATION AND CLASS ACTION/JURY TRIAL WAIVER PROVISION THAT REQUIRES THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES, RATHER THAN JURY TRIALS OR CLASS ACTIONS, AND ALSO LIMITS THE REMEDIES AVAILABLE TO YOU IN THE EVENT OF A DISPUTE. PLEASE READ THE ARBITRATION SECTION CAREFULLY.

TABLE OF CONTENTS

(*See* ECF No. 5-2 at 11–16 ("Ex. B") at 12; *see also* Howard Decl. ¶ 10.)  Defendant's "**Binding Arbitration Agreement and Class Action Waiver**" can be found under the "**DISPUTE RESOLUTION**" heading:

Binding Arbitration Agreement and Class Action Waiver. You and we agree that we will resolve any controversies, claims, counterclaims, or other Disputes between you and us or you and a third-party agent of ours (each a "Claim") through binding and final arbitration, instead of through court proceedings, in accordance with the Rules of the American Arbitration Association ("AAA Rules"), except as the AAA Rules are altered by these Terms. This arbitration agreement applies to any existing or future Claims that you have not individually filed in a court of law prior to the date you agreed to these Terms. The AAA Rules are available at www.adr.org or by calling 1-800-778-7879. You and we hereby waive any right to a jury trial of any Claim (defined below). The arbitration will be heard and determined by a single arbitrator. The arbitrator's decision in any such arbitration will be final and binding upon the parties and may be enforced in any court of competent jurisdiction. You and we agree that the arbitration proceedings will be kept confidential and that the existence of the proceeding and any element of it (including, without limitation, any pleadings, briefs or other documents submitted or exchanged and any testimony or other oral submissions and awards) will not be disclosed beyond the arbitration proceedings, except as may lawfully be required in judicial proceedings relating to the arbitration, by applicable disclosure rules and regulations of securities regulatory authorities or other governmental agencies, or as specifically permitted by state law. The Federal Arbitration Act and federal arbitration law apply to this agreement. However, the Arbitrator, and not any federal, state, or local court or agency, shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of this Agreement including, but not limited to, a claim that all or any part of this Agreement is void or voidable.

(*See* Ex. B at 15.)  Plaintiff attests that she "was unaware of any contractual terms . . . applicable to [her] use of the Website" and "did not click on any hyperlink containing any

---

nonmoving party, *see Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991), the Court accepts Plaintiff's screenshot of the Order Review page for purposes of this Motion.

[3]    "In the computing world, a hyperlink is a word, phrase, or image—typically underlined or in blue font—that the user can click on to jump to a new document or a new section within the current document." *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 453 n.2 (2021).

25-CV-937 TWR (KSC)

contractual terms applicable to [her] use of the Website." (*See* ECF No. 7-5 ("Cody Decl.") ¶ 3.)

## LEGAL STANDARD

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, governs arbitration agreements in any contract affecting interstate commerce, including those found in employment contracts. *See Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 119, (2001); *see also* 9 U.S.C. § 2. The FAA "provides that 'an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190, 1193 (9th Cir. 2024) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)).

Courts review arbitration agreements in light of the "liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983); *Soto v. Am. Honda Motor Co.*, 946 F. Supp. 2d 949, 953–54 (N.D. Cal. 2012). "If a party ignores its agreement to arbitrate, the other party may ask a court to issue 'an order directing that such arbitration proceed in the manner provided for in such agreement.'" *Fli-Lo Falcon*, 97 F.4th 1190 at 1194 (quoting 9 U.S.C. § 4). Further, "[i]f an agreement exists, the FAA 'leaves no place for the exercise of discretion by a district court, but instead mandates that [it] shall direct the parties to proceed to arbitration.'" *Id.* at 1193 (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985)).

## ANALYSIS

Defendant contends that Plaintiff entered into a binding agreement to arbitrate when she clicked the "Place Order" button, which notified her that, "[b]y clicking 'Place Order' you agree to J.Jill's **Terms of Use**," which included an arbitration clause. (*See generally* Mot.; Mem.) "Generally, in deciding whether to compel arbitration, a court must determine two 'gateway' issues: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Brennan* 796 F.3d at 1130 (citing

*Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)).  Plaintiff opposes Defendant's Motion under the first of these inquiries, contending that she lacked actual or constructive notice of the Terms of Use and arbitration provision.  (*See* Opp'n at 1, 3–15.)  Defendant bears the burden of demonstrating by a preponderance of the evidence that there exists an agreement to arbitrate, *see Hansen v. Rock Holdings, Inc.*, 434 F. Supp. 3d 818, 824 (E.D. Cal. 2020) (citing *BG Grp., PLC v. Rep. of Argentina*, 572 U.S. 25, 60 (2014); *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015); *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014)), *rev'd on other grounds*, 1 F.4th 667 (9th Cir. 2021), and the Court gives Plaintiff "the benefit of all reasonable doubts and inferences that may arise." *Three Valleys Mun. Water Dist.*, 925 F.2d at 1141.

"In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).  "To form a contract under . . . California law, the parties must manifest their mutual assent to the terms of the agreement."  *See id.* (citing *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 29 (2d Cir. 2002) (applying California law)).

"Parties traditionally manifest assent by written or spoken word, but they can also do so through conduct."  *Id.* (citing *Specht*, 306 F.3d at 29).  "However, '[t]he conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents.'"  *Id.* (alteration in original) (quoting Restatement (Second) of Contracts § 19(2) (1981)).  "These elemental principles of contract formation apply with equal force to contracts formed online."  *Id.* at 855–56.  "Thus, if a website offers contractual terms to those who use the site, and a user engages in conduct that manifests her acceptance of those terms, an enforceable agreement can be formed."  *Id.* at 856.

"Most courts now have identified at least four types of internet contract formation, most easily defined by the way in which the user purportedly gives their assent to be bound

by the associated terms: browsewraps, clickwraps, scrollwraps, and sign-in wraps." *Sellers*, 73 Cal. App. 5th at 463. "A '*browsewrap*' agreement is one in which an internet user accepts a website's terms of use merely by browsing the site." *Id.* (emphasis in original). "A '*clickwrap*' agreement is one in which an internet user accepts a website's terms of use by clicking an 'I agree' or 'I accept' button, with a link to the agreement readily available." *Id.* (emphasis in original). "A '*scrollwrap*' agreement is like a 'clickwrap,' but the user is presented with the entire agreement and must physically scroll to the bottom of it to find the 'I agree' or 'I accept' button." *Id.* at 463–64 (emphasis in original). "'*Sign-in-wrap*' agreements are those in which a user signs up to use an internet product or service, and the sign-up screen states that acceptance of a separate agreement is required before the user can access the service." *Id.* at 464 (emphasis in original). "The 'wrap' methods of online contract-formation provide varying degrees of notice to users, with browsewrap providing the least and scrollwrap providing the most." *B.D. v. Blizzard Ent., Inc.*, 76 Cal. App. 5th 931, 946 (2022) (citing *Sellers*, 73 Cal. App. 5th at 471). Although, generally speaking, "California 'and federal courts have reached consistent conclusions when evaluating the enforceability of agreements at either end of the spectrum, generally finding scrollwrap and clickwrap agreements to be enforceable and browsewrap agreements to be unenforceable,'" *id.* (quoting *Sellers*, 73 Cal. App. 5th at 466) (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014)), "there is no per se rule of validity or invalidity." *See In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1165 (N.D. Cal. 2016).

Defendant characterizes the agreement at issue here as a "hybrid 'clickwrap' / 'browsewrap' online agreement." (*See* Mem. at 6.) It is undisputed that Plaintiff did not have actual notice of Defendant's Terms of Use. (*See* Cody Decl. ¶ 3.) Consequently, "an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *See Berman*, 30 F.4th at 846

(citing *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017); *Nguyen*, 763 F.3d at 1173)); *see also, e.g.*, *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154–55 (9th Cir. 2025) (applying same test to a website that the parties "agree[d] . . . resembles something between clickwrap and browsewrap" but that the Ninth Circuit determined "most closely resembles a 'sign-in wrap agreement'"); *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 515 (9th Cir. 2023) (same for a case where the relevant terms "lie somewhere in between" a clickwrap and browsewrap agreement).

   "This test has two aspects: the visual design of the webpages and the context of the transaction." *Godun v. JustAnswer LLC*, 135 F.4th 699, 709 (9th Cir. 2025). "Both aspects 'should be considered together.'" *Id.* (quoting *Chabolla*, 129 F.4th at 1155) (citing *Sellers*, 73 Cal. App. 5th at 477); *see also Chabolla*, 129 F.4th at 1155 ("The nature of the service or goods offered and the visual aspects of every page of a multi-page transaction should be considered together." (citing *Oberstein*, 60 F.4th at 515–16; *Sellers*, 73 Cal. App. 5th at 477–80)). "This means that courts should expect that a reasonable internet user is more vigilant in looking for contractual terms when the context of the transaction reasonably implies a contractual relationship." *Godun*, 135 F.4th at 709.

   With regard to the visual requirements to provide conspicuous notice, "this is a matter of whether an advisal is 'displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it.'" *Godun*, 135 F.4th at 709 (quoting *Berman*, 30 F.4th at 856). "This largely centers on an analysis of the 'visual aspects of the notice' within the 'overall screen design.'" *Id.* (quoting *Keebaugh*, 100 F.4th at 1019) (citing *Long v. Provide Com., Inc.*, 245 Cal. App. 4th 855, 865–66 (2016)). "[T]his inquiry is 'fact-intensive' and is informed by the 'totality of the circumstances.'" *Id.* (quoting *Oberstein*, 60 F.4th at 514). "Following California caselaw, [the Ninth Circuit] ha[s] discussed certain factors relevant to [courts'] visual analysis of webpages and hyperlinks, such as the location of the advisal on the webpage or the font size, color, and contrast (against the page's background)." *Id.* at 709–10 (first citing *Long*, 245 Cal. App. 4th at 865–66; then citing *Oberstein*, 60 F.4th at 516–17; then citing *Berman*,

30 F.4th at 857; then citing *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1221 (9th Cir. 2019); and then citing *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 79 (2d Cir. 2017)).  The Ninth Circuit has cautioned, however, that "[t]here is no bright-line test for finding that a particular design element is adequate in every circumstance."  *See id.* at 710 (quoting *Chabolla*, 129 F.4th at 1156–57).

In *Berman*, for example, the Ninth Circuit "deemed the [below] notice insufficient":



*See Chabolla*, 129 F.4th at 1162 (Bybee, J., dissenting).  Specifically, the court concluded that "[t]he text disclosing the existence of the terms and conditions on the[] websites [wa]s the antithesis of conspicuous" because it was "printed in a tiny gray font considerably smaller than the font used in the surrounding website elements, and indeed in a font so small that it [wa]s barely legible to the naked eye," whereas "[t]he comparatively larger font used in all of the surrounding test naturally direct[ed] the user's attention away from the barely readable critical text."  *See Berman*, 30 F.4th at 856–57.  Further, the hyperlink was "simply underscore[d]," without the "[c]ustomary design elements denoting the existence of a hyperlink[,] includ[ing] the use of a contrasting font color (typically blue) and the use of all capital letters."  *See id.* at 857.

More recently, the Ninth Circuit concluded that, "[c]onsidering the [following] notice in the full context of the transaction, [it] would not expect a reasonably prudent

1  internet user to be on inquiry notice of the contract" because "[t]he advisal [wa]s not . . .

2  located directly above or below the action button and [wa]s displayed in relatively small

3  text," *see Godun*, 135 F.4th at 712 (citing *Oberstein*, 60 F.4th at 516):



26  *See id.* at 705.

27      In *Oberstein*, by contrast, the Ninth Circuit concluded that the following screens "did

28  enough to provide constructive notice of the Terms," *see* 60 F.4th at 516:



/ / /

/ / /

/ / /

/ / /

25-CV-937 TWR (KSC)



*See Chabolla*, 129 F.4th at 1163–64 (Bybee, J., dissenting).  Specifically, the Ninth Circuit explained that "a reasonable user would have seen the notice and been able to locate the Terms via hyperlink" because the "notice [wa]s conspicuously displayed directly above or below the action button" and "the 'Terms of Use' hyperlink [wa]s conspicuously distinguished from the surrounding text in bright blue font, making its presence readily apparent."  *See Oberstein*, 60 F.3d at 516.

In *Patrick v. Running Warehouse, LLC*, 93 F.4th 468 (9th Cir. 2024), the Ninth Circuit also "found a single screen sufficiently conspicuous":

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**Desktop Version of Running Warehouse Website**

| Items Ordered | Quantity | In Stock | Price | Total Price |
|---|---|---|---|---|
| Nike Spark Lightweight Crew Socks 4 Black | 1 | Yes | $16.95 | $16.95 |

| | | | Subtotal: | $16.95 |
| Shipping Method: | UPS Ground | | Sales Tax: | $1.57 |
| Estimated Delivery: | 4/1/22 | | Shipping: | $0.00 |

Edit Your Order                                    TOTAL:    $18.52

Place Order

By submitting your order you confirm you are 18 years of age or older and agree to our privacy policy and terms of use.

Copyright © 2021 Running Warehouse. All Rights Reserved. Terms of Use | Privacy Policy | Your California Privacy Rights | Contact Us | Site Map | Accessibility
US: 1.800.606.9598 | Careers

**Mobile Version of Running Warehouse Website**

Sales Tax:                                                    $1.57
Shipping:                                                     $0.00

TOTAL:                                                       $18.52

Place Order

By submitting your order you confirm you are 18 years of age or older and agree to our privacy policy and terms of use.

Edit Your Order

*See Chabolla*, 129 F.4th at 1165 (Bybee, J., dissenting).  Specifically, the Ninth Circuit concluded that "website provided reasonably conspicuous notice of the Terms" because it "explicit[ly]" included "clear and legible" "notice on the final order review page, directly below key information such as the purchase total, and directly below the button [the plaintiff had] tapped to complete his purchase . . . on an uncluttered page[,] . . . not hidden or obscured" with "the hyperlinked phrase 'terms of use' . . . colored bright green—contrasted against the surrounding white background and adjacent black text" and "the same color as other clickable links on the page, suggesting clearly that it is a hyperlink." *See Patrick*, 93 F.4th at 477.

16

Similarly, the Ninth Circuit reversed a district court order that found that the following sign-in pages failed to provide reasonably conspicuous notice:



25-CV-937 TWR (KSC)

2020 Version

*See Keebaugh*, 100 F.4th at 1010–11, 1020–21. The Ninth Circuit concluded that "the visual requirements to provide conspicuous notice" were "satisf[ied]" because the relevant admonition ("'By tapping "Play" I agree to the Terms of Service' or 'By tapping "Play" I accept the Terms of Use and acknowledge the Privacy Policy'") was "[d]irectly beneath the operative Play button," *see id.* at 1020; "[t]he design elements use[d] 'a contrasting font color' making the notice legible on the dark background," *see id.* (quoting *Berman*, 30 F.4th at 857); and "the sign-in screen lack[ed] clutter and use[d] '[c]ustomary design elements denoting the existence of a hyperlink,'" *see id.* at 1021 (third alteration in original) (quoting *Berman*, 30 F.4th at 857).

On the whole, the notice at issue here more closely resembles those in *Oberstein*, *Patrick*, and *Keebaugh*.  Although the text of the notice may be "considerably smaller than the font used in the surrounding website elements,"[4] it is not "so small that it is barely legible to the naked eye," *see Berman*, 30 F.4th at 856–57, or placed on a cluttered page or obscured.  *Cf. Patrick*, 93 F.4th at 477.  It does not appear that Defendant attempted to render the text of the notice less conspicuous by, for example, rendering it in a color lighter than surrounding text of a similar size.  *See, e.g.*, *Patrick*, 93 F.4th at 477 (finding conspicuous notice in black text with green hyperlinks against a white background); *cf., e.g.*, *Chabolla*, 129 F.4th at 1156–57 (finding notice "written in a small gray font against a white background" to be "notably timid in both size and color" and "not 'prominently displayed'").  The hyperlink to the Terms of Use is also more conspicuous than those in *Berman* and *Godun*, being both underlined and in a blue font, like other hyperlinks on the

---

[4]    The California Court of Appeal in *Seller* indicated that it is appropriate to "consider the size of the textual notice in relation to the other text on the screen."  *See* 73 Cal. App. 5th at 481.  Here, Plaintiff's counsel attests that the notice is in "in a 9 point type size in a font called 'BrandonGrotesque-Regular,'" (*see* ECF No. 7-1 ("Ferrell Decl.") ¶ 3, whereas "ORDER REVIEW" "is approximately in the 34 point type size"; "SHIPPING" and "PAYMENT METHOD" are "approximately in the 25 point type size"; "PLACE ORDER" is "in approximately 16 point type size"; and the statement "Once all information is correct, clicking Place Order will charge your card for your order" is "approximately in the 12 point type size."  (*See id.* ¶¶ 4–6.)

page.  *See, e.g.*, *Chabolla*, 129 F.4th at 1156 (noting that "the use of a blue font can be reasonably conspicuous"); *Patrick*, 93 F.4th at 477 (noting that the relevant hyperlink was conspicuous and consistent with other hyperlinks found on the page).  Finally and critically, the text of the notice is located directly below the "Place Order" button, *see, e.g.*, *Keebaugh*, 100 F.4th at 1020; *Patrick*, 93 F.4th at 477; *Oberstein*, 60 F.3d at 516, not "outside of the user's natural flow."  *Cf. Chabolla*, 129 F.4th at 1157.

Although the design of the website alone might support concluding that the notice would be reasonably conspicuous, the Court is required to "consider . . . the 'full context of the transaction,'" . . . such as whether the type of transaction 'contemplates entering into a continuing, forward-looking relationship' that would be governed by terms and conditions."  *See Godun*, 135 F.4th at 710 (first quoting *Sellers*, 73 Cal. App. 5th at 477; then quoting *Keebaugh*, 100 F.4th at 1017) (citing *Chabolla*, 129 F.4th at 1155–56).  Generally speaking, courts are more likely to conclude that a user anticipating "some sort of continuing relationship" would expect to be bound by terms, whereas a user "who simply purchases goods or avails herself of a one-time discount offer" would be less likely to form such an expectation.  *See Chabolla*, 129 F.4th at 1155.

> Following California caselaw, [the Ninth Circuit] ha[s] considered, for example, (1) whether the transaction contemplates a "continuing relationship" by creating an account requiring a "full registration process," *Oberstein*, 60 F.4th at 517 (quoting *Sellers*, 73 Cal. App. 5th at 480); (2) whether the user is entering a "free trial," *id.*; *Blizzard*, 76 Cal. App. 5th at 947; (3) whether a user enters "credit card information," *Meyer*, 868 F.3d at 78, 80; and (4) whether the user has downloaded an app on their phone (suggesting consistent accessibility), *Keebaugh v. Warner Bros. Entm't Inc.*, 100 F.4th 1005, 1020 (9th Cir. 2024); *cf. Herzog v. Super. Ct.*, 101 Cal. App. 5th 1280, 1303 (2024).

*Godun v. JustAnswer LLC*, 135 F.4th 699, 710 (9th Cir. 2025) (cleaned up).

Here, it is undisputed that Plaintiff did not create an account with Defendant, electing instead to check out as a "guest."  (*See* Cody Decl. ¶ 2.)  This context distinguishes this case from those in which the Ninth Circuit has found that the context of the transaction would put a user on inquiry notice that use of a company's website or services constituted

an agreement to its terms and conditions, including an arbitration provision. *Cf., e.g.*, *Keebaugh*, 100 F.4th at 1020 (concluding that context of transaction was sufficient to put users on inquiry notice where users were downloading mobile game onto phone because "the entire point of the download is to have continued access to play the game"); *Oberstein*, 60 F.4th at 517 ("[T]he context of this transaction, requiring a full registration process, reflected the contemplation of 'some sort of continuing relationship' that would have put users on notice for a link to the terms of that continuing relationship." (citing *Sellers*, 73 Cal. App. 5th at 480)); *cf. also Lawrence v. Finicity Corp.*, No. 24-1737, ___ Fed. App'x ___, 2025 WL 547375, at *2 (9th Cir. Feb. 19, 2025) (reversing district court's denial of motion to compel arbitration because, "[o]nce alerted to [the defendant]'s role in the transaction, a reasonable consumer would expect to have a continuing, forward-looking relationship with the entity they are entrusting with their bank data to track their account over time" (internal quotation marks omitted) (quoting *Keebaugh*, 100 F.4th at 1017)). Indeed, this case most closely resembles *Sellers*, in which the California Court of Appeal noted that "most consumers would not expect to be bound by contractual terms" when engaging in a "trivial" transaction like "the sale of a single item, such as a pair of socks." *See* 73 Cal. App. 5th at 464–65. The context of the transaction therefore weighs against concluding that Plaintiff was sufficiently aware that, by placing an order through jjill.com, she would be entering into an agreement including an arbitration provision.

Ultimately, "the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers." *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1179 (9th Cir. 2014). Viewing the evidence most favorably to Plaintiff in light of the context of the transaction and drawing all inferences in her favor, the Court concludes that Defendant has failed to meet its burden of establishing that its notice was sufficiently conspicuous to bind Plaintiff to its Terms of Use, including the arbitration provision. Accordingly, the Court **DENIES** Defendant's Motion without addressing the Parties' remaining arguments concerning delegation of arbitrability and unconscionability.

/ / /

## CONCLUSION

In light of the foregoing, the Court **DENIES** Defendant's Motion to compel Plaintiff to arbitration.  Accordingly, Defendant **SHALL RESPOND** to Plaintiff's First Amended Class Action Complaint within <u>twenty-one (21) days</u> of the electronic docketing of this Order.

**IT IS SO ORDERED.**

Dated:  June 30, 2025

Honorable Todd W. Robinson
United States District Judge